Good morning. Illinois Appellate Court First District Court is now in session. The Third Division, the Honorable Justice Margaret McBride presiding, case number 22-0288, Brucki v. Orland Fire Protection District. Good morning, everyone. My name is Margaret McBride, and I will be presiding over this hearing. I do want to advise parties that Justice Robert Gordon is the third panel member. However, he is unable to be present for this Zoom argument today. But as you all know, these proceedings are being recorded, and Justice Gordon will have the full benefit of your presentations today. With that, I'm going to ask the attorneys that are going to present oral argument to identify yourselves by name for the record. Good morning. Good morning, Justices. This is Patrick Walsh on behalf of the appellant Ken Brucki. Good morning. Good morning, Judge. Vince Mancini on behalf of the Pension Fund. Good morning, Mr. Mancini. All right, before we proceed, I would let both of you know that you will have about 15 minutes to present oral argument. From that, Mr. Walsh, as representing the appellant, you'll have some time for rebuttal. During Zoom proceedings, our division has let the attorneys present, well, I should have said 10 minutes, uninterrupted 10 minutes to present argument. And after that, we will question appellant's counsel first, then Mr. Mancini, you will have again about 10 minutes to present oral argument and have questions for you at that time. And then we will return to Mr. Walsh for any rebuttal remarks. So before we proceed, I'm going to put on my little timer. But I will tell you that this division is very generous, the attorneys and their time presenting and we rarely, if ever, cut anyone off. But be mindful of the time, if you would. So with that, Mr. Walsh, we will let you proceed. Thank you. And thank you, Justices. May it please the court. This is Patrick Walsh, on behalf of Appellant Ken Brucky. Mr. Brucky was the Fire Chief of the Orland Fire Protection District. And he seeks reversal of the Circuit Court's January 27, 2022 order, affirming the district's pension board's final administrative decision of May 14, 2019, which computed his firefighter's pension benefit using a salary that was less than the salary attached to the rank at the time of his retirement. There are two issues raised on appeal. The first is whether the board committed a reversible error by calculating Mr. Brucky's August 21, 2015, rather than on January 4, 2016, which was the date of his retirement. When Mr. Brucky applied for his pension on August 21, 2017, the board had one job, calculate one half the monthly salary attached to the rank held by Mr. Brucky in the fire service on the date of his retirement. That was it. The Illinois Pension Code defines salary as, quote, the annual salary attached to the firefighter's rank. The undisputed evidence received by the board during the underlying administrative hearing established that Mr. Brucky was the Fire Chief at the time of his retirement. Mr. Brucky remained the Fire Chief throughout his employment with the district and until retirement. Mr. Brucky received a 3% cost of living increase on January 1, 2016, and Mr. Brucky retired as the Fire Chief on January 4, 2016. And finally, that 3% cost of living increase that he received on January 1 meant the salary attached to the rank of Fire Chief on the date of his retirement was $186,449. At that point, the board's job was to award a pension based upon one half of that salary and then computed using his time of service. But rather than compute his pension benefit using those undisputed facts, the board computed his salary at an amount from August of 2015. Now, I'm sure that you've had time to look at these briefs and seen talk of an employment agreement and a retirement agreement that Mr. Brucky entered into, both of which were effective on the date of retirement. Now, the employment agreement was executed in June of 2013 and set Mr. Brucky's retirement date at the end of May of 2016. So if Mr. Brucky never entered into a retirement agreement, he would have received a 3% cost of living increase on January 1, 2016. Entry into the retirement agreement didn't change that fact because the district provided in 2016 a 3% cost of living increase across the board to all non-union employees. So Mr. Brucky, on January 1, 2016, had two entitlements to a 3% cost of living increase. Number one, through the employment agreement, and number two, through the district's policy providing that same increase to all non-union employees. So as we know, the district paid Mr. Brucky the 3% increase. The board in its briefs says it's unrefuted that Mr. Brucky did not receive the 3% pay increase. But the board had Mr. Brucky's pay stubs before in evidence, and the pay stubs indicate that Mr. Brucky received a 3% increase. It was found on his January 11, 2016 final pay stub. And when the district paid Mr. Brucky for his unused sick time on February 23, 2016, it bought that time using the hourly rate that included the 3% pay increase. So with respect to anything being unrefuted, it's unrefuted that he received the 3% increase and that that should have been used to calculate his benefit. Now the board in its response brief looks to the Village of Hanover Park case for the proposition that salary must be fixed and regular to qualify for pension benefits. But according to the Illinois Administrative Code, a salary is fixed when it's a payment in a predetermined amount. And it's regular if it's scheduled. To be regular does not mean it has to be repetitive. It only has to be scheduled. And to be fixed, it needs to be in a predetermined amount. And Mr. Brucky's pay increase qualified under both of those definitions. Putting aside for a moment, the separate entitlements to the 3% raise is provided to all non-union employees. The board asserts that the retirement agreement voided the employment agreement. With all due respect, that is incorrect. The retirement agreement provided that Mr. Brucky was, quote, entitled to all benefits and compensation applicable to the rank of fire chief in accordance with the terms of the OFPD and existing agreements. And I think that we can OFPD meant the Oil and Fire Protection District. So in the retirement agreement, there was no salary number found in that clause or anywhere else in the retirement agreement. So as the board posits, if the retirement agreement voided the employment agreement, the district wouldn't have known what to pay Mr. Brucky between August and January of 2015 and 2016. But the district knew what to pay Mr. Brucky because his compensation was set by the terms of the OFPD and existing agreements. So the effect of the retirement agreement was just to shorten Mr. Brucky's term and to remain or to leave his compensation in place. And that compensation, again, at the risk of sounding repetitive, was set by, one, the employment agreement, and, number two, the district policy to give all non-union employees that 3% raise. This interpretation is underscored by the district's behavior in, one, paying the raise, and in, two, its continued enforcement of both agreements. On February 23rd, 2016, a month and a half after Brucky retired, the district served Mr. Brucky with a memo noting that it was enforcing the retirement agreement, whereby he had to repay $12,000, $12,500, and the employment agreement, allowing him to buy back his sick time. So the district enforced both agreements post-retirement. The only evidence that the board received to establish what the existing agreements constituted was the continued reliance on the terms of compensation provided under the employment agreement. Now, to the extent that the existing agreements or that the employment agreement was voided by the retirement agreement, little evidence could be used because we have competing provisions. We have one provision in the retirement agreement that says the employment agreement is voided, and we have another provision in the retirement agreement that says existing agreements shall continue to control this compensation. So to the extent that the board looked at parole evidence, again, as I've said, the district continued to enforce both agreements and paid them according to the employment agreement or its own policies. Now, the board ultimately adopted what I would call a fatally flawed decision of the Department of Insurance, and I won't touch on all of those misgivings, but I think it's important to note that the Department of Insurance found that Brucky was not a firefighter on his date of retirement. It did so by applying a, quote, routine performed firefighting duties test by misreading Section 6.3 of the Fire and Police Commissioners Act that does not appear in the pension code. Mr. Walsh, I'm just going to let you know you have about a minute on your 10 minutes that we wanted to give you. Thank you very much. With that, I'll jump to the second issue, which is whether Mr. Brucky's due process rights were violated. Mr. Brucky was required to receive notice, an opportunity to be heard, a right to cross-examine, witnesses, and impartiality. With respect to notice, Kerry Collins, the board's attorney, noted during the hearing that the board had met in November and December of 2016 without notice to Mr. Brucky, and that at that December 6, 2018 meeting that the board had finalized its decision on Mr. Brucky's application, and that from there the issue was concluded. Mr. Collins referred to Mr. Brucky's raise as a pension spike. Mr. Collins provided testimonial evidence at the hearing in opposition to Mr. Brucky's application, although he was supposed to be an impartial hearing officer. Mr. Collins accepted testimony from Trustee Schick during the hearing, and Mr. Brucky obviously had no opportunity to cross-examine Mr. Schick, and Mr. Collins himself provided opinion testimony during the hearing that was adverse to Mr. Brucky. From the outset, Mr. Collins abandoned his role as an impartial hearing officer and adopted the role as an adversarial counsel tasked with obtaining a denial of Mr. Brucky's application. So, to conclude, the unrebutted evidence in this case established that Mr. Brucky's final salary on the day or attached to his rank on the day of his retirement was $186,449. That should have been used to compute his final benefit, and the process by which the hearing was held violated his right to due process due mainly to Mr. Collins' adversarial conduct. Thank you. Justice Reyes, do you have some questions at this time for Mr. Walsh? Yes. Mr. Walsh, why should the Pension Board be bound by an agreement between other parties, you know, the Fire Protection District and the appellant? Because if the Fire District worked out, as was alleged, a sweetheart deal or to spike the appellant's salary, wouldn't the Pension Board have to abide by that agreement? Doesn't the Pension Board have an obligation to the public? Yes, the Pension Board absolutely has an obligation to the public and a fiduciary duty to its members. I don't deny that. I just would respectfully disagree with the characterization of a sweetheart deal because these 3% increases with respect to the employment agreement were negotiated in 2013, and in terms of the district, was awarded to all non-union employees. So had Mr. Brucky not entered into the retirement agreement, he was still entitled to that 3% raise and could have retired at any time after January 1st of 2016, and his pension should have been calculated at that increased rate. Okay. Do you view the retirement agreement as ambiguous? I view it as ambiguous with respect to the compensation provisions because there is no compensation found in the retirement agreement. It does say it voids the employment agreement, but it also says that compensation will be determined by existing agreements, and Mr. Brucky's compensation was found in the employment agreement. Okay, so I know you mentioned some evidence, but is there any other evidence that suggests that the appellant's entitled to the later retirement date and the higher salary amount? Well, the retirement date, I believe, was his choice. He could retire whenever he wanted to, and he chose a date as part of that retirement agreement of January 4th. In terms of the receiving the payment, the pay stub, the village paid him whatever hours he was paid for in 2016 was paid at the rate that included the 3% increase, as were the hours that were bought back. They were bought back at the rate that included the 3% increase. Okay. In regards to the pay stub, I have a question with regards to the board referring to the December 28, 2015 pay stub. Yes. And then the January one appears that there's an increase, but was that ever presented to the circuit court for consideration? I think it was part of the underlying record. I'm not sure. I apologize. I can't recall whether that was specifically addressed, but it's certainly a part of the record. Because you would agree that the January 2016 check appears that there is an increase in the salary? That's correct. The 3% increase is reflected in the pay stubs from 2016. All right. And then the advisory opinion from the Illinois Department of Insurance characterized Pellant's leave as a paid administrative leave awarded in lieu of disciplinary actions. Do you agree with that characterization? No, I think it was just an agreement. I think there was a disagreement in philosophy. I don't believe that there were charges ever filed against Mr. Ruckey, so I don't think this was a negotiated leave. I'm not aware of any disciplinary charges against Mr. Ruckey, so to that extent, I would disagree with that characterization. Okay. I have no further questions at this time. Thank you, Your Honor. Mr. Walsh, the retirement agreement actually sets a retirement date, doesn't it? It does. So is this just simply a matter of that he actually retired, and the parties agree, January 4, 2016? Yeah, I don't believe that's in dispute. That was his retirement date. Okay. And doesn't the statute require that a pensioner receives pension benefits based upon the date of retirement? It does. So do you see this as a rather simple case? Very. The parties have absolutely incorporated something that isn't ambiguous. In the retirement agreement, that being that the fire chief's retirement date is January 4, 2016. That is correct. Now, you've also suggested, contrary to your opposing counsel, that he was indeed, or in fact, paid according to the higher salary. And you suggest that by way of pay stub that I think was from January 11. Was that exactly the last pay stub? That was the last pay stub reflecting salary. There was one pay stub reflecting the buyback of saved time from later on. Okay. But the one reflecting salary unequivocally shows that his salary had been computed based on a 3% loss of living rights. That's correct. All right. Well, I know counsel's going to disagree in these. I think it's added. We'll let you respond, Mr. Rancini. Um, but on the other hand, the fact that these payments were made does not bar the pension board from interpreting the provisions of these two agreements, does it? In other words, he could have been overcompensated. And of course, that's sort of what the board determined when they decided that his his pension was not, his final salary was not $186,000. I'm just rounding it off versus the $186,000. I agree that they're entitled to make an interpretation as they see. I would just suggest that Mr. Collins believed and the board believed that this was a pension spike, whereas it was negotiated years earlier. And the cost of living rates had been given to all non-union employees. Correct. All right. Now, let me ask you this. During his period of, what was it called? Administrative leave? That's correct. But the retirement document also maintains his post. They say that he is He's the fire chief, right? Okay. Now, during the period of August 2015. Under Cambridge Engineering versus Mercury Partners, we cited in the brief, that constitutes waiver. But nonetheless, the standard is applied and then an interpretation of credible service is a clearly erroneous standard. And it's been already noted to the panel that the term paid leave is not defined in the statute. But paid leave has been considered in other instances. And what factors to consider in whether or not paid leave constitutes a return to service. The Kronholm decision, 2016 ILAP 3rd 150122 lists some factors in considering whether or not a firefighter returned to service and thereby is not entitled to retirement benefits. And those factors almost mirror the factors here in that Chief Brucke was replaced by an acting fire chief. It's in the retirement agreement. It says he is to only take direction from the new acting fire chief. In addition, he's to return all personal property to stop using the vehicle he was given. All of those factors favor the determination that he was not a firefighter for purposes of the creditable service statute. Again, creditable service requires you to be a firefighter. Furloughs, leaves of absence without pay do not count. The interpretation that this in fact was a paid leave of absence for which he doesn't get credible service is subject to the clearly erroneous standard. And in fact, is the right decision in this case. What the DOI decided was not whether or not he was regularly performing duties. That's a misconception and a misstatement of what they found. What they actually found was he was similar to a reserve or paid on-call firefighter. And the statute expressly excludes reserve and paid on-call firefighters from being able to get creditable service as a firefighter. They're not firefighters under the admin code. So because they're not firefighters under the if in fact, which is unclear in the record, whether or not chief Brucky received or made payments toward the pension fund during the four months or so when he was on paid leave, that doesn't swing the vote here. That's not a factor when considering whether or not he gets credible service because he's entitled to a refund of all those proceeds of those contributions. If he doesn't get creditable service time for them, that's clear in the law, but it's not clear in that equates to the right to more credible service. In fact, I don't think there's a decision out there with all due respect to justice McBride that says that, that because you pay in a pension fund, you're entitled to credible service for the time you pay into the fund. There are instances when you can continue to pay into the fund. For example, if you're on a disability, because you want to acquire more creditable service during the time of your disability, but that's not the case here. As it relates to the due process argument, yes, I don't deny that chief Brucky did not receive notice of the December hearing, but he did receive notice in March. He came to that hearing, he presented an opening statement, he testified, he was given a continuance to try to challenge the DOI opinion. All of the matter, the entire factual matter was open and continuing throughout March, April, and May. When they reconvened the pension hearing on his retirement benefits, counsel Walsh appeared, he gave a closing argument, similar to the arguments he's presented to this panel. That is due process. That's sufficient due process for purposes of administrative hearings. We cite the case law in our brief that supports that concept. The last argument he makes is that the decision was already made. Well, it wasn't already made. They had a hearing. When the hearing was over, they decided to adopt a written decision in order that was pre-written. It was written in advance. That's entirely appropriate. As a former appellate clerk, I understand that sometimes there are decisions written at the time of oral argument, for example. That's a basis for which the panel or the deciding body is to review the case. It doesn't mean they've adopted that decision at that time. They only adopted once they take a vote. The vote here didn't occur until well after Chief Ruckey was allowed to present evidence, present argument, contest the DOI ruling, try to reverse that ruling. That's when the vote occurred. That's when the decision was made. He had due process as it relates to this hearing. All right. Anything further before we begin our questions of you, Mr. Mancini? No, Your Honor. All right. Justice Reyes. Yes. Thank you, Mr. Mancini. If I understand your argument, what you're asserting is that the Pension Board isn't bound by the agreement between the district and the appellant. It's not bound by that? Yes, that's correct, Judge. All right. But in its entirety or in part and parcel or? Well, I think it can certainly rely on that as evidence, and it can certainly interpret that agreement to understand what the intent of the parties was. Yeah, but I'm just talking about the agreement itself right now. I'm not talking about the evidence, just the agreement itself between the two parties. Is the Pension Board bound by that agreement? It's not a party to the agreement, but it can rely on it. It's evidence. It was in the You're not bound by that agreement? Well, I think you'd have to go back to the fact that the municipality and the Pension Board are separate legal entities. And I can't cite the case off the top of my head, Judge, but it's a long-determined piece of Illinois law that the Pension Board is a separate legal entity from the municipality. Okay. Great. All right. Now, I know you referenced also the check that received in March, and I guess that was for sick pay and vacation time, correct? Yes, sir. All right. And you did not refer to it as salary, but isn't it still a form of compensation? It is, but it's a form of compensation that's not included in the term salary under the pension code. Sick time and vacation time is not part of salary. Unpaid, sick and unpaid vacation time, it doesn't get included in your salary calculation. Okay. But you would agree that it appeared that the check in March reflected some type of an increase. Maybe it was a 3% increase, maybe it wasn't, but it was some type of an increase, right? There was an increase in the unused sick and vacation pay that he received. All right. Which means that he's paying into the pension fund at that rate of, he's receiving the compensation from the pension fund, he is being considered at that higher rate of pay, whatever it may be. No, he actually didn't pay that any portion into the pension fund from his unused sick and vacation pay. None of the money went to the pension fund because it was post-termination of his employment, it was paid out as a lump sum afterwards. That's why it's not included in pension salary in that regard. Okay. And then the other question I have with regards to the pay stubs. So his compensation or his salary they received in December, the December 28th check, is that for, although he wasn't on service, but was that for services as a fire chief under this administrative leave from November or was that compensation from December? So that was his year-to-date compensation from the time, I guess, in August when he ceased being the fire chief until the end of the year, 2015. Okay. Got it. All right. Okay. And so your argument is that the January check that appears to have an increase in it, which Mr. Walsh is referring to, is not reflective of the 3%? No, it's not, Judge. It's a 0.5% difference. The rate of pay went from $87.13 to $87.63. And I'm good enough at math to tell you that's a 0.5% increase, not a 3% increase. I can't explain that. Again, I don't think it's my burden to in a hearing of this nature, but it's not 3%. Okay. And as a fire chief, even if he is on administrative leave, is he considered a union or a non-union employee? He is a non-union municipal employer or he's an employee of the district. All right. So earlier that year in December, prior to December, weren't all the non-union employees in the district given a 3% bump in salary? The testimony was that from Mr. Brucky, that there was a 3% increase effective January 1st of 2016. I don't have any evidence in the record to establish that nor to confirm that. Okay. All right. All right. And then with regards to the testimony, it's my understanding that the appellant testified, but he didn't testify under oath. At the first hearing, correct, where he showed up when they were making the decision on his retirement benefit, he appeared in the, at the hearing and he spoke to the board refusing to go under oath. All right. So that particular testimony shouldn't be considered by us then, should it? Yeah. I don't know that it's entirely relevant other than the fact that he identifies his salary at the time, judge. But then he did testify in March under the questioning of attorney Walsh. Okay. All right. And then I have a question with regards to the letter that was sent by the pension board's council and the explanatory memorandum that was attached to it, to the department of insurance, asking for an advisory opinion. Do you consider that memorandum to be fact neutral, the representations in the memorandum to be fact neutral? Well, I don't consider it to be evidence. I don't know that it should have been part of the record, but it was. But nonetheless, I don't, I don't actually recall because it doesn't have significance to me, frankly, as to whether or not Mr. Collins was being biased in his representation of the facts. Although the DOI decision that came out after that point does appear to be an unbiased interpretation of the accurate facts. I don't think there's anything inaccurate in the DOI's letter. All right. Do you know why they didn't want to send out a reconsideration? They were asked to send out another letter and they denied doing so? Yeah, the DOI roughly around that time decided it was going to stop rendering opinions of this nature, which has now left a lot of pension boards fumbling in the dark. So yeah, the DOI stopped giving opinions. Okay. So that's across the board, not just in this case. Yes, sir. Okay. All right. And what makes you think, or what makes the pension board think that the appellant's salary was spiked for purposes of his pension calculation? Mr. Collins used that term. It's not a term that I would use. But what's happened is the city of countryside case is a classic example of a pension spike case, where an agreement is reached between the municipality and in that case, the collective bargaining unit for longevity for officers in that case that had been serving for more than 20 years, the three weeks of the new year, the first three payments of the first three salaries of the strike, all that the first three payroll checks of the new term, they get a $500 bonus. And what what pension boards were doing was taking that $500 bonus and extrapolating it over the full time of the year. And these individual officers then walking away with a pension spike of $6,000 if you prorated over the full year. So what I think Mr. Collins was drawing an analogy to is to that instance, where now he's asking for a 3% spike, though he never actually received that as salary. Nowhere in the record does it show he received a 3% increase on his salary. So I think that's what Mr. Collins was drawing the analogy to when talking about a pension spike. Again, it wouldn't be a term I would have used, but I think that's what he's referring to. Okay. All right. I have no further questions. It's time just to move right. So Mr. Mancy, do you really think that the countryside case is analogous to these facts? I don't judge. Okay. I'm just Yeah, I'm just saying, I think, you know, comparably speaking, when they talk about a pension spike, in that case, I think Mr. Collins was using the term similarly, I guess. Well, and and you would agree that other firefighters in the village on January 1, 2016, did get a three non union did get a 3% pay increase. Wouldn't you agree? It's not in the record. I don't I don't show anything in the record that would establish a 3% increase across the board to non unions. All right. Well, was there testimony from Mr. Brucker, that as of January 1, 2016, non unit union employees were entitled to a 3% cost of living increase? He did state that. Yes. So isn't that in the record that is there anything that the board contradicted with or refuted with other evidence? Yeah, his pay stub from January. All right. So you're saying that the January, the pay stub, the pay stub after January 1, which was issued on the 11th does not reflect this 3%. Yes, ma'am. It does reflect some increase, but you don't know what that represents. I don't judge. All right. There's no testimony on that. And you know, we're not reviewing the circuit courts decision. I think you and Mr. Walsh would both agree that the appellate court does not decision. It reviews the decision of the administrative agency we're reviewing. Correct? Yes, ma'am. Correct. All right. Now, I'm going to ask you if the retirement date, if we determine as a matter of law or based on the clearly erroneous standard of review, if we determine that Mr. Brucky's retirement date was actually January 4, 2016, is your position sound or reasonable? Or would you concede that if we make a determination that his retirement date was not in August, as suggested by you, but that it in fact was January 4, 2016, is your argument, does it still hold any good reasoning? It does, Judge, because what happened is Attorney Walsh was confusing creditable service with the salary calculation. They're two distinct determinations. January 4 can be the retirement date. That's fine. And when you look at the code and you look at the evidence and you look at the pay stubs, his salary as of January 4 was the $181,220. And then when you look at creditable service calculation, that's a different section of the code. So a retirement date of January 4 doesn't necessarily mean he gained creditable service from the August 20th date until January 4. Well, what would determine that? Now you're actually saying that it really doesn't matter if he retired or his effective date of retirement was January 4, 2016. Hasn't your position been continually that his retirement was effective in August? For purposes of creditable service, yes, because that's the statute. We're just interpreting the statute. The statute tells us and the administrative code tells us he's not a firefighter from August until January. That's what the case law tells us. All right. All right. So if you're wrong about that, that he is a firefighter under the statute, then your argument also falls, doesn't it? If he's not, if I'm wrong that he's, I'm sorry, can you restate it? Sure. Your position is that he was no longer a firefighter after August 15th. As defined under the administrative code, yes. Of course. But then again, you and Mr. Walsh have a differing opinion on which provision of the code applies. Isn't that true? No, I think we agree that the same provision applies, but Mr. Walsh wants to interpret it to require continual or opportunity to serve. And that's not what the statute says. Okay. I thought there was some dispute about him being a civilian employee. No, no. I think he's been called by the DOI and adopted by the pension board. He was called a reserve or paid on call firefighter during that paid administrative review period or administrative leave period. Okay. So I'm not really understanding your position now about his retirement date because doesn't the statute, the pension provision provide that the pension is calculated at the salary at the time of retirement? Yes, ma'am. And that salary was 181, 220 as established by his pay stuff. Okay. So I guess I'm going to ask you this question again. Now you're saying that his right. It's the salary attached to the rank on the date of retirement. Yes. Okay. So on the date of retirement. So are you agreeing now that his date of retirement is January 4th? I've never disagreed with that, your honor. Okay. So on January 4th, according to the retirement agreement or actually the provisions for firefighters in the village, each one of those non-union employees received, well, you're saying it's questionable that they received a 3% cost of living increase. Again, all the board has is the evidence in front of the board is a pay stub and the interpretation of a retirement agreement that doesn't include any COLA increases. Okay. But it doesn't really define his salary either. It does not expressly define itself. Okay. So, so, but it does, go ahead. It does void. What was his prior definition of salary? Okay. So how could any salary then be determined if the other agreement was void and the retirement agreement doesn't have any provision about a salary? Because there is evidence in the record, again, of a salary attached to rank at the time of his retirement. And was that as the, and was that as a fire chief? Yes, ma'am. Okay. So he's still a fire chief, but, but you're saying he's really not a firefighter. Correct. You just said he is a fire chief. He has the title. He has the title. Okay. He's not doing anything. He's sitting at home. Okay. Does the retirement agreement require him to be on call? I have to go back and look. My recollection was he's to take any orders from the acting fire chief if necessary, but he, you know, I guess it doesn't say that expressly. I don't believe I have to go and look, judge. It's been too long. Okay. All right. Well, we'll, we have the record. And my other question to you is, was, I think you said this isn't in the record, but was, if he was his, would his pay stub from December indicate that he was still making payments into the pension system? I'm looking, judge, bear with me. Okay. I need to use my magnifying glass judge. There is a pension. I'm sorry. Excuse me. Let not Mr. Walt, Mr. Mancini address. If you would, Mr. Walsh, we'll give you an opportunity. Yeah. So his, his January or his December 28th paycheck shows a penchant pension contribution current in year to date. Yes. Pension pension contributions were made from that check. But you're saying that doesn't really determine creditable service. It doesn't under what the DOI and the statutes tell us. Specifically explain that if you would, Mr. Mancini. Sure. Because he, what the statutes administrative code requires that he'd be an active firefighter in order to get credible service. Credible service is the time served as a firefighter of a municipality. That's the definition. The use of the absence are not included in that. Well, we're not talking about a leave of absence, are we? No, no, no. But, but there are, this is a paid leave of some sort. And the pension code doesn't read, doesn't specifically refer to his situation. Does it? It does not judge. Okay. What we were stuck with interpreting then was the administrative codes definition of what a firefighter was. And that, that then does not include chief Brucky under the Kronholm decision. So it's, it's a multi-layered analysis. It's not simply just because he has a hat and a badge and a uniform, he's a firefighter. And that's what Kronholm tells us. You have to look at what he was actually doing and was he acting as a firefighter for the village? And I think, I think the DOI and the board did that analysis properly under the code and found that he wasn't. All right. I just want to ask you one final question. So could you just, I, I'm not sure I understand your position that, that the pension isn't determined by his actual retirement date. Yeah. The pension benefits, what he receives in benefit is not determined by the actual retirement date. What is it determined by? The creditable service? Yes, ma'am. Yeah. So you set a salary based on retirement date. What was the salary attached to rank on the date of retirement? And then you use a math equation to determine what creditable service he receives of that salary. Okay. What if we determined that the salary that he was entitled to on January 4th included this cost of living? That's your discretion. That's not supported by the record. Okay. Well, I, I think there's clear evidence in the record that he did not retire until January 4th, 2016. But you're, you're suggesting, I'm not sure I understand why you've determined, or at least it seemed to me in the brief that you were arguing that he effectively retired in August. For purposes of salary judge on August, on January 4th, his salary was set in his pay stub. It was set and fixed. And we can't as a pension board, give him a 3% increase of that amount. We don't have that discretion. We are not suggesting you do. I think that that your argument is sort of shifted today, but perhaps I'm wrong. Yeah, no, I, with all due respect, I don't think it shifted at all. I think what's happened is, is we've confused creditable service with as a basis for, for calculating salary. And it just isn't, it's two separate portions. And as we pointed out, the credible service issue was never even raised in the circuit court level. It wasn't until in my, my response brief, I raised the credible service issue to try to clarify what Mr. Walsh had written in his brief, because credible service has nothing to do with salary. If he had 30 years of credible service or 27 years of credible service, that's not a factor in what his salary is for pension purposes. All right. But if he were actually employed or considered a fire chief on January 1st through the 4th, would he, are you saying there'd be no way that he could be entitled to this 3% cost of living that other non-union employees received? Yeah, what I'm saying is that the fixed regular pay on that date and time as established by the federal government, look beyond that. And on top of that, the employment agreement that called for the 3% or COLA increase was avoided by the municipality and Mr. Brucky. That's what the pension board was faced with at the time of this decision. It's not as if we were somehow involved in and underhanded with Mr. Brucky and said, oh yeah, yeah, you retire January 4th and everything's fine. That's not what happened. They vacated the employment agreement, got rid of the 3% increases. He presented evidence as to his salary on January 4th. That salary was 181,220, and the pension board found accordingly. All right. Well, there's no information in the retirement agreement about salary at all, is there? Except that it voided the mechanism by which his salary was set. Okay. So then the pension board was to determine what that salary was. Is that right? That's right. Even though there's nothing in that agreement? Yes, ma'am. Because we weren't a party to it. All right. I understand. But so then what did you use to determine his salary? His testimony and the pay stuff. All right. Okay. Justice Reyes, any further questions for Mr. Mancini? Your mic is off. Okay. Any further questions? Yeah, I apologize. I have to say one more question, and I lost it. Sorry, I apologize. Didn't the board, I'm sorry, didn't the department when it opined on the can't find the exact language, but then the department will find that as long as the individual is on administrative paid leave, all right, and is paying in that they're not restricted or bound by the pension code. I don't know if that's the exact wording, but that's what I thought was rendered by the department. I don't think that's accurate, Justice Reyes. Let me see if I can find it. All right. So you don't think that was accurate? I don't. Here's what they did say. They said the division finds it reasonable that paid leaves of absence would count towards creditable service. If salary was paid and contributions were taken of that salary because a firefighter is still a member of the department and such conclusion is not otherwise barred by the pension code. However, it is the division's opinion that in this instant matter, the paid administrative leave is not credible service as Chief Brucky was not a member of the department. But how do you reconcile with the fact that he's on administrative leave? He could still take orders from the acting chief. So he's still technically a member of the department. Even though he's sitting at home, you know, I mean, if the acting chief needs him, you know, he could call him up and order him to assist. But what the administrative code instructs us on to whether or not he's a member of the fire department says it's purposes of section firefighter is any person appointed fire department or fire protection protection district, except the following persons are not included. And who are those persons? Part-time firefighters call it semicolon auxiliary reserve or voluntary firefighters, including paid on call firefighters, semicolon clerks and dispatchers and other civilian employees of the fire department or fire protection district. We're not routinely expected to perform firefighter duties, semicolon and elected officials. So which one do you do you contend that he fits into in that section, paid firefighter on call? Right, we agree with the DOI's determination that he was a reserve or paid on call firefighter for purposes of this interpretation of his obligations under the retirement agreement because under Cronholm, he never re-entered service as a firefighter. But that was never re-entered. When did he leave? Again, would that be in August? No, the re-entry is my, that's a misstatement on my part because Cronholm considered re-entry, but it considered factors for re-entry. And we just drew the analogy to that. Okay. But in the retirement agreement, he is not defined in any of those All right. Mr. Walsh, you have time for a brief rebuttal. Thank you, your honor. Two minutes. Okay. Very quickly, I want to address the pay issue. Council has brought up the December 28th pay stub from 2015 and the February pay stub from 2016. The January 11th pay stub is the key pay stub. Council talked about doing math. We did the math. The January 11th pay stub reflects 32 hours worked in 2015 at the 181 salary and change. It reflects eight hours at the 186, 449 pay rate for one day in 2016. So if you combine those, if you average them, it comes out to the 0.05% that council mentioned. What it also indicates is that his rate of pay in 2016 was undoubtedly 186, 449, which included a 3% increase. Let me stop you for a second. There's quite a heated debate now about this pay stub. Mr. Mancini has agreed that whatever that pay stub is determines his salary. I think I'm accurate. Now, he says it doesn't reflect the 3% increase. Your position, I think if I say it correctly, is that between December, you know, the last time of his pay, till January 4th, included 32 hours before that pay increase took effect, correct? Correct. So that after January 1st, he worked eight hours, is that it? That's correct. And that according to your calculations, that represents 32 hours paid at the 181, which reflects the dates before the cost of living kicked in, and eight hours from January 1st to the 4th, which reflects the 3% pay increase. That's exactly right. Okay. All right. With respect to the Kronholm decision, I just want to make clear, Kronholm was based on an interpretation of the definition of firefighter from section 117A of the pension code, which is for municipalities that have not adopted the Fire and Police Commission Act. Section 117A requires that to be a firefighter, you're actually responsible for fighting fires. Kronholm retired, took a period of pension, then came back as an administrator. And the question was, after he went on retirement and came back as an administrator, was he a firefighter and responsible for actually fighting fires? The Kronholm decision is really, you know, not directly related to this decision, because it interpreted a different section of the code, which does not apply here. With respect to the due process argument, counsel said that, with respect to due process, that Mr. Ruckey just had to be heard. Well, that might be true, but as I noted earlier, he also had to receive notice, which they admitted he didn't, to two hearings, a right to cross-examine witnesses, which they didn't address. And with respect to impartiality, I just want the court to remember that on March 5th, 2019, the second to last hearing date, Mr. Collins said, we're here on a motion to reconsider. And it's Mr. Ruckey's burden now to show that this board should not adopt the Department of Insurance decision as its final decision. So I think that is combined, not refusing of an opportunity to be heard and a lack of partiality. And finally, Justice Reyes, I heard you ask about whether the board was bound by the agreement. And that's sort of an open question here, whether they're bound by parts of the agreement or all the agreement. What I will say is they were bound by the evidence presented to it at the hearing, which was the pay stub, which was the 3% increase by non-union employees, which was the date of retirement on January 4th. And the fact that he retired as the fire chief, they are bound by that evidence and any other decision, including the one that they made, would be arbitrary if they didn't follow that evidence. So with that, I will conclude and thank you for your time. Justice Reyes. No questions. All right. Thank you, Mr. Walsh. Thank you, Mr. Mancini. We appreciate your arguments today. The case was well-argued and well-briefed and will be taken under advisement. Thank you.